**COUNTIES**

**RETIREMENT SYSTEMS – INVOLUNTARY SEPARATION UNDER THE PRINCE GEORGE'S COUNTY SUPPLEMENTAL PENSION PLAN**

February 23, 1995

*The Honorable Robert H. Kittleman*
*House of Delegates*

You have requested our opinion on two questions related to the Prince George's County Supplemental Pension Plan for General Schedule Employees (the "Plan"):

1.     You ask whether we agree with the conclusion of the Plan's private counsel that the Plan's "involuntary separation" provision applies to elected officials who are barred from seeking reelection by the term limitation provisions in the Prince George's County Charter.

2.     Citing press accounts describing the decision by the trustees of the Plan to add certain benefits for Plan participants who were "involuntarily separated" from County service, you ask whether the trustees had authority to create this new benefit without the approval of the County Council.[1]

For the reasons stated below, our opinion is as follows:

1.     We disagree with counsel's interpretation of the "involuntary separation" provision. In our view, the provision does not apply to elected officials who are barred from reelection by term limits in the Prince George's County Charter.

2.     Because the County Council gave the Plan's trustees extraordinarily broad authority to amend the Plan and later effectively ratified all of the trustees' amendments, the trustees acted

---

[1] You also asked whether, if the trustees did exceed their authority, the benefits awarded under that provision could be rescinded.  In light of our conclusion that, taking into account the actions of the County Council, the trustees did not exceed their authority, this question is moot.

within their authority when they independently added certain augmented benefits for those who were "involuntarily separated" from County service.

We hope that this opinion, which identifies one legal error that resulted in the award of benefits outside the intent of the Plan, will serve as a catalyst for the trustees, the County Executive, and the County Council to reexamine the Plan from top to bottom. Given the dire financial situation now facing Prince George's County, the Plan deserves a very hard look.

## I

### History of the Plan

On June 5, 1990, the Prince George's County Council adopted a resolution for "the purpose of amending the Salary Plan of the County to reflect new pay rates and other benefits for General Schedule employees." Resolution No. CR-37-1990.[2] The resolution approved "a supplemental retirement benefit" and incorporated a document that summarized this new benefit, among others.

Section IX-E of the attachment to the resolution began with the following general description of the new "supplemental retirement benefit": "Effective December 30, 1990, employees covered by this salary schedule may elect to participate in a supplemental retirement benefit program *pursuant to rules established in the Supplemental*

---

[2] Under Article IX, §903 of the Prince George's County Charter, "Salaries and wages of both classified and exempt service employees shall be determined in accordance with classification and salary plans." The latter are submitted in resolution form. *See* §16-125(a) of the County Code. The County Code defines "Salary Plan" more broadly than "salaries and wages," the terms used in the Charter. Under §16-102(53) of the Code, a "Salary Plan" is a "compilation of salary schedules ... setting forth the compensation for employees .... As used herein, the term 'compensation' shall mean and include the base salary rates of all ... employees and any other special salary rates *and fringe benefits* ...." (Emphasis added.) We express no view on the procedure that has been used over the years to establish fringe benefits like pension benefits. We do note that, in any event, an ordinance has codified the Plan. Bill No. CB-101-1994 (effective January 1, 1995). *See* note 20 below and accompanying text.

*Retirement Plan.* The supplemental retirement program will be jointly funded through County and employee contributions." (Emphasis added.) The attachment then outlined certain benefits, vesting requirements, and a funding mechanism, together with a few definitions, but the Council was content simply to recognize that the details of the new benefit program were largely set out in the "Supplemental Retirement Plan" to which the resolution attachment referred.

The Plan document provides that "[t]he Trustees shall have administrative powers and duties with respect to the Plan provided in the Trust Agreement and all other powers and duties with respect to the Plan described herein." §8.1. The term "Trustees" is defined as "the person or persons who, at the particular time, constitute the Board of Trustees under Article III of the Trust Agreement." §1.27.

The Trust Agreement was entered on December 31, 1990, "between Prince George's County, Maryland, a body corporate and politic ... and Frank W. Stegman, Michael J. Knapp, and Eric Tucker, as Trustees ...." Under Article III, §1 of the Trust Agreement, "the operation and administration of the Fund shall be the joint responsibility and administration of a Board of Trustees comprised of three Trustees designated by the Employer."[3] Article III, §3 provides that "Trustees may be removed and replaced at will by the County Executive."

The Trust Agreement and the Plan document vest extremely broad powers in the trustees. Article IV, §2 of the Trust Agreement leaves construction of the agreement up to the trustees and provides that "[a]ny construction adopted by the Trustees in good faith is binding upon the Employer and the Employees." The Trust Agreement goes on to empower the trustees, among other things, to "take all actions and make all decisions necessary or proper to carry out the provisions of the Plan," "make and enforce such rules and regulations as they shall deem prudent for the efficient administration of the Plan," "interpret the Plan," and "decide questions concerning the Plan and the eligibility of any employee to participate therein and the rights of any person to receive benefits

---

[3] The term "Employer" means Prince George's County. Article I, §7. The Trust Agreement was executed on behalf of the County by the County Executive. The "Fund" means the Trust Fund for the Plan. Article I, §8.

thereunder." Article IV, §3b, c, d, and e. The Plan document, moreover, vests in the trustees a unilateral right to amend the Plan: "Either the County or the Trustees may at any time modify or amend the Plan in whole or in part ...."[4]

The trustees have exercised their power to amend the plan eleven times. The third of these amendments, effective February 1, 1992, provided for the "discontinued service benefit" that is the focus of your inquiry.

This new benefit, embodied in §3A.3 of the Plan, is available to "a Participant who is involuntarily separated from service as an Employee for any reason unrelated to a disciplinary action or a disability ... immediately upon such separation from service, provided that the Participant has 15 or more years of Eligibility Service." Plan §3A.3(a). As originally set out in the third amendment to the Plan, a participant eligible for the discontinued service benefit would receive a percentage of annual compensation (ranging from 12 to 20 percent, depending on the number of years of creditable service) immediately after separation from service as

---

[4] The power to amend in the Plan document states that it is limited by contract and vested rights. The full text of Section 12.1(a) is as follows:

> Either the County or the Trustees may at any time modify or amend the Plan in whole or in part, except to the extent otherwise provided by any contract to which the County is a party, including any agreement between the County and any collective bargaining unit representing any of the Employees of the County, as such agreement shall be in effect from time to time; provided however, that any modification or amendment of the Plan shall not affect, unless expressly set forth in the amendment or modification, or adversely affect in any case, any rights or benefits under the Plan existing at the date of such modification or amendment in respect of any Participant who shall have retired, been retired or otherwise ceased to be in the employ of the County prior to set date, or adversely affect accrued benefits under the Plan existing at said date in respect of any Participant who at said date shall be in the employ of the County.

a County employee, instead of waiting until normal retirement age. §3A.3(b).  In addition, the discontinued service benefit called for "a lump sum benefit equal to 100% of all or any portion or the sum of ... Participant's annual leave balance multiplied by the Participant's final base hourly rate of pay, plus ... the Participant's sick leave balance multiplied by the Participant's final base hourly rate of pay ...."  §3A.3(e)(i).[5]  The Plan amendment contemplated County funding of this augmented benefit:  "The County must contribute to the Trust Fund from time to time such amounts as are actuarially determined to be required to provide the benefits described in this Section 3A.3 to the extent that they exceed the benefit that would have been payable to the Participant under §3.3," which is the ordinary benefit amount under the Plan.  §3A.3(f).[6]

A little more than two years later, on May 1, 1994, the trustees changed the method of calculating the discontinued service benefit. This amendment asserted that, although the amount of the discontinued service benefit was stated in the original amendment as a percentage of the participant's average annual compensation ranging between 12% and 20%, "such percentage was intended to be 150% of the basic benefit calculated under Section 3.2 of the Plan." The trustees then observed that, because "the Plan has since been amended to increase the basic benefit, with no corresponding increase in the discontinued service benefit ..., the Trustees wish to amend the plan to clarify that the discontinued service benefit shall equal 150% of the basic benefit ...."  An amendment to §3A.3(b) achieved that result.[7]

---

[5] Ordinarily, an employee who leaves County service receives a lump sum payment for the value of all of the employee's accumulated annual leave and 50 percent, rather than 100 percent, of the value of the employee's accumulated sick leave.  *See* §16-221.02(a)(3) of the Prince George's County Code.

[6] The third amendment to the plan also contained a number of other changes unrelated to the discontinued service benefit.

[7] This amendment, by itself, apparently did not significantly increase the discontinued service benefit.  Coupled with an increase in the normal benefit accrual the next month, however, the discontinued service benefit did increase significantly.  *See* Tenth Plan Amendment dated June 26, 1994.

The only other amendment to the discontinued service benefit was

(continued...)

## II

### Term Limits and "Involuntary Separation"

#### A.    Introduction

In order to be eligible for the discontinued service benefit, a Plan participant must have been "involuntarily separated" from County service. Plan §3A.3(a). The term "involuntarily separated" is not defined. The Plan does make clear, however, that the benefit is not available if the separation results from disciplinary action or disability. *Id. See also* §3A.3(g).

Article III, §307A of the Prince George's County Charter provides as follows: "No person shall be eligible to serve more than two consecutive terms on the County Council." The same section also provides that: "No person shall be eligible to serve more than two terms as County Executive." These term limits were added to the Charter by an amendment approved by the voters in November 1992.

On July 6, 1994, the private firm that provides pension counsel to the County offered its opinion "whether elected officials who are precluded from running for another term due to the County's term limitations are eligible for the discontinued service benefit provided for under Section 3A.3 of the Plan." Counsel's analysis was that elected officials barred from seeking reelection by charter term limitations fall within the category of those who are "involuntarily separated":

> Section 3A.3 was adopted in 1992 and, as I recall, was drafted with the intent that it applied to employees who were terminated as a result of a reduction-in-force. However, ... it was not drafted so narrowly as to apply only to such employees. Basically, an employee

---

[7] (...continued)
made by the trustees on December 1, 1994. The trustees expressed a wish "to amend the Plan to allow Participants who receive a discontinued service benefit ... to elect to receive their first year's benefit in an actuarially reduced lump sum." New language was added to §3A.3(b) to achieve that result.

> must have at least 15 years of Eligibility Service under the Plan and must meet two additional tests. Clearly these elected officials meet the first test, because their separation from service is not related to disciplinary action or disability.  The second test is whether they are being "involuntarily separated from service." *Black's Law Dictionary* defines involuntary as "without will power or choice."  It would seem that these elected officials meet this definition because the term limitation provisions take away their ability to choose whether or not to run for an additional term.

Letter from Cheryl O'Donnell Guth, Esquire, to Kathleen W. Colbert, at 2 (July 6, 1994).[8]

For the reasons stated below, we are unable to agree with this construction of the pertinent provision of the Plan.  Much the better construction, in our view, is that the "involuntary separation" language does not apply to elected officials who are ineligible to seek another term because of term limitations.

Nevertheless, we must emphasize a point also touched on in pension counsel's letter:  Very broad authority to interpret the provisions of the Plan, including questions about eligibility, is vested in the trustees.[9]  *See* Plan §8.10; Trust Agreement Article IV, §§2 and 3d and e.  When the trustees adopted counsel's interpretation, they acted within the scope of this grant of authority.  Hence, unless the trustees reassess their conclusion or a court or legislative body compels a different result, their interpretation, albeit one with which we disagree, will remain effective.

---

[8] On August 1, 1994, the County Office of Law indicated its concurrence with pension counsel's conclusion.  Memorandum from Bernadette F. Lamson, Esquire, to David L. Goode, at 2.

[9] As Ms. Guth wrote:  "The Plan's Trust Agreement gives the Trustees the power to interpret the plan and to determine an employee's eligibility to receive benefits.  Based upon the foregoing, I believe the Trustees may conclude that elected officials who are prevented from seeking an additional term because of the County's term limitations are entitled to a discontinued service benefit ...."  Letter at 2.

## B.     *Eligibility of Elected Officials*

A threshold question is whether elected officials are entitled to participate in the Plan.  The resolution enacting it was in the form of an amendment to the County's salary plan "for General Schedule employees."   Resolution No. CR-37-1990.   Elected officials are obviously not General Schedule employees.

The answer lies in an earlier Council resolution, No. CR-179-1985, which enacted a leave and benefits program "for exempt service employees."  Among other things, this resolution provided as follows:  "All exempt employees are entitled to and subject to the same retirement and pension benefits as are provided by the Personnel Law or other law to classified service employees of the County."  §E.1. Under this resolution, the "exempt employees" who gained this parity included "elected officials."[10]

Hence, when the County Council created the Supplemental Pension Plan for General Schedule Employees in 1990, that new benefit became available to exempt service employees, including elected officials, by virtue of the 1985 resolution granting exempt employees the same retirement and pension benefits as are provided to other employees.  The Plan document itself correctly recognized the interaction of the two resolutions by defining the term "Covered Employee" to mean, in part, "any elected official (within the meaning of Section 902(1) of the Prince George's County Charter) ...."  §1.8.  Thus, the premise of the term limits analysis − that elected officials are covered by the Plan and potentially eligible for the discontinued service benefit − is correct.

---

[10] The County Charter specifies an annual level of "compensation" for Council Members and the County Executive.  Article III, §308, and Article IV, §406.  This "compensation" may only be changed by an affirmative vote of not less than two-thirds of the members of the Council," effective with the start of a new term.  *Id*.  The pension parity language in Resolution No. CR-179-1985 was not inconsistent with the Charter, however, because the "compensation" referred to in §§308 and 406 is the annual salary, not future benefits like a pension entitlement.  *Cf*. 78 *Opinions of the Attorney General* 296, 301 (1993), ("Although in an economic sense a pension may be said to be a type of deferred compensation, a pension has certain unique characteristics ....  It results in no current receipt of money benefits nor, in fact, anything additional *during* the term.")

### C.    *"Involuntarily Separated"*

We agree with pension counsel's suggestion that analysis of the meaning of "involuntarily separated from service" must begin with that language, "as the words of the statute, given their ordinary and popularly understood meaning, are the primary source of legislative intent." *Gargliano v. State*, 334 Md. 428, 435, 639 A.2d 675 (1994).[11]  "In so doing, however, the words ... must be 'read in light of the full context in which they appear, and in light of external manifestations of intent or general purpose available through other evidence.'"  334 Md. at 436 (quoting *Cunningham v. State*, 318 Md. 182, 185, 567 A.2d 126 (1989)).

It is indeed true that term limits are "involuntary," in the ordinary sense of that word.  That is their very purpose – to deprive an incumbent of the discretion to seek another term, in order to achieve the presumed benefits of new leadership.

A term limit does not "separate" an incumbent from office, however; the expiration of the incumbent's term does.[12]  Term limits, rather, are best understood as a qualification applicable to seekers of the new term.  The qualification is that someone who held the office for the previous two terms is ineligible for another consecutive term.  *See Thorsted v. Gregoire*, 841 F. Supp. 1068, 1078-79 (W.D. Wash. 1994); *U.S. Term Limits, Inc. v. Hill*, 872 S.W.2d 349, 357 (Ark.), *cert. granted*, 114 S.Ct. 2703 (1994); *Stumpf v. Lau*, 839 P.2d 120, 123 (Nev. 1992).

---

[11] Given the Plan's incorporation into a resolution, its subsequent recognition in an ordinance, and its governmental nature, we believe that principles of statutory construction ought to be applied to the Plan document.

We note that a provision of federal law on early retirement, 5 U.S.C. §8336(d)(1), uses the term "separated from the service involuntarily." *See also* 5 U.S.C. §5595(b)(2) (severance pay for employees "involuntarily separated from the service").  We have reviewed the small body of federal cases that interpret this language but find little in them that potentially bears on this problem.  Moreover, we have no evidence that the pertinent provision in the Plan had been drawn from this federal law.

[12] "Separate" means to "disconnect or sever."  *Black's Law Dictionary* 1364 (6th ed. 1990).

The incumbent's term simply ends by operation of the law that defines the duration of the elected official's term, quite independently of whether the incumbent is eligible for a successive term. The end of a term, by itself, is not the equivalent of involuntary separation. *See* 66 *Opinions of the Attorney General* 211, 222 (1981).[13]

Our construction – that the fact of a term limit makes an incumbent ineligible for another consecutive term but is not the proximate cause of the incumbent's separation from County service – seems to us not only consistent with the text but also far more harmonious with the apparent purpose of the discontinued service benefit. While contemporaneous documentation of the actions of the trustees in adopting the benefit does not explain its purpose,[14] the Plan's annual report dated August 9, 1993, does describe the benefit as applying to employees "who are involuntarily separated ... because of a reduction in force." Annual Report at 5.

Material from sources knowledgeable about the Plan likewise reflects this sense of the purpose of the discontinued service benefit. As noted above, pension counsel's letter states a recollection that the discontinued service benefit "was drafted with the intent that it applied to employees who were terminated as a result of a reduction-in-force." *See* Part IIA above. An earlier letter from the County's Chief Administrative Officer corroborates that understanding of the underlying purpose: "In order to protect senior employees in the event of a reduction in force, the Trustees of the General Schedule

---

[13] That opinion concluded that an elected official who "actively sought and was denied reelection" was involuntarily terminated. 66 *Opinions of the Attorney General* at 223. It might be argued that the incumbent who is denied the opportunity to seek reelection by a term limit is functionally in the same situation as one who seeks reelection and loses. We do not believe that such an extension of the 1981 opinion to this context is warranted, however, for the conclusion in that opinion was linked to statutory language that expressly referred to the possibility of an incumbent who was "not ... reelected." *See* 66 *Opinions of the Attorney General* at 222. If the language in the relevant State statute at the time had been identical to that in the Plan, the opinion would have been different.

[14] The minutes of the pertinent meeting of the Board of Trustees simply recite the Board's action in adopting the discontinued service benefit. Minutes of meeting of April 10, 1992.

Plan adopted a discontinued service benefit." Letter from Major F. Riddick, Jr., to Mrs. Ann Landry Lombardi, Chair of the County Board of Ethics, at 5 (January 7, 1993). In a letter to the Attorney General on the same date, the Chief Administrative Officer likewise characterized the discontinued service benefit as one "provided for employees who are terminated for non-disciplinary reasons (*e.g.*, a reduction in force) after 15 years of service." Letter from Major F. Riddick, Jr., to Attorney General Curran, at 3 (January 7, 1993).[15]

This purpose is not served by treating elected officials ineligible for reelection because of term limits as if they were the victims of a reduction in force. The discontinued service benefit serves to attract and retain employees who serve the County indefinitely, by giving them an economic offset to the risk of losing their jobs if layoffs are needed. Surely no comparable consideration applies to those who seek elective office, for they do so with full awareness that with the office comes a finite term.[16]

In short, to say that a term limit "involuntarily separates" an elected official from office is to stretch the language so that it covers a situation far from the problem intended to be addressed by the provision. We do not endorse such a construction.[17]

---

[15] Mr. Riddick's letter sought an opinion on the narrow issue whether an in-term increase of pension benefits for elected officials would violate Article III, §35 of the Maryland Constitution. We concluded that such an increase would not violate that provision. Opinion No. 93-032 (August 11, 1993) (unpublished).

[16] Indeed, office holders in a charter home rule county are always "subject to the possibility that they may be ousted under the provisions of the Home Rule Amendment providing for the adoption [and amendment] of a charter." *County Commissioners v. Supervisors of Elections*, 192 Md. 196, 213, 63 A.2d 735 (1948). *See also Town of Glenarden v. Bromery*, 257 Md. 19, 262 A.2d 60 (1970).

[17] We have not been asked, and therefore do not address, any question about the application of the "involuntary separation" language to individuals other than elected officials.

## III

### Authority of the Trustees

In our opinion, the Board of Trustees of the Plan acted within the authority presently granted it by the County Council when they created the discontinued service benefit.

Through its Resolution No. CR-37-1990, the County Council amended the County's Salary Plan "to reflect ... new pay rates *and other benefits* for General Schedule employees." One of these other benefits was "a supplemental retirement benefit" that was included within a "salary schedule" document "submitted and recommended by the County Executive ..., which is attached hereto and made a part hereof ...." This salary schedule document, which thus became part of the resolution itself, referred to "a supplemental retirement benefit program pursuant to rules established in the Supplemental Retirement Plan." The County Council thereby endorsed the Plan document.

The Plan document, in turn, could hardly be more expansive in its grant of authority to the trustees to add new benefits. Under §12.1(a) of the Plan, the trustees have coextensive authority with the County "at any time [to] modify or amend the Plan in whole or in part ...."[18] The trustees quite properly have recited their authority under §12.1(a) every time they have amended the Plan, including the amendment to create the discontinued service benefit. Moreover, nothing in §12.1(a) or any other provision dealing with the power of the trustees requires them to seek County Council concurrence for a proposed expansion in benefits under the Plan, even though new benefits would obviously increase the cost of the Plan to the County.[19]

---

[18] *See* note 4 above for a limitation on that authority. We have not been asked, and therefore do not address, any question about the County Council's authority to have vested this degree of standardless authority in the trustees. Because the County Council has now ratified all amendments to the Plan made by the trustees, *see* note 20 below and accompanying text, this question may be moot in any case.

[19] According to an actuarial evaluation of the Plan issued on May 21, 1993, the unfunded actuarial accrued liability of the Plan increased from just under $16 million as of January 1, 1991, to $25.7 million as of

(continued...)

Although the trustees made amendments to the Plan on their own authority, without County Council involvement, the Council has explicitly recognized the breadth of the trustees' authority. In Resolution No. CR-40-1993, adopted on June 22, 1993, "[f]or the purpose of amending the Salary Plan of the County to reflect new maximum pay rates and other modified benefits for General Schedule employees," the Council approved the following language: "The Board of Trustees for the Supplemental Pension Plan may establish contributions and benefit approval rates, maximum benefits and special retirement incentives or provisions as it deems appropriate; provided, however, that employee benefits under this plan may not be reduced without prior approval of the County Council." *See also* Resolution No. CR-56-1994 (same language). If the trustees may not *reduce* benefits without prior County Council approval, the obvious implication is that the trustees may *increase* employee benefits without prior approval of the Council, which is precisely what the Plan document expressly allows and what the trustees have done.

Finally, on July 19, 1994, the Council codified the Supplemental Retirement Plan. *See* Bill No. CB-101-1994. Under §16-232.02(a) of the County Code, the Plan, "as established by CR-37-1990, *and amended from time to time*, is hereby recognized." (Emphasis added.)[20] This language can only be viewed as a ratification by the Council of the amendments made by the trustees.[21]

---

[19] (...continued)
January 1, 1993. *See also* note 20 below.

[20] This bill also expanded the Board of Trustees to five members, one of whom is elected by the Plan's members. "The remaining members of the Board of Trustees shall be designated and appointed by the County Executive." §16.-232.02(b). The bill, which became effective on January 1, 1995, also provides for a cost sharing mechanism between the county and the employees to eliminate the unfunded liability.

[21] Whether the County Council knew the details of the amendments effected by the trustees is of no legal significance. *See* 71 *Opinions of the Attorney General* 350, 360 (1986).

# IV

## Conclusion

In summary, it is our opinion that:

1.    The "involuntary separation" provision in the Supplemental Retirement Plan does not apply to elected officials who are barred from reelection by term limits in the Prince George's County Charter.

2.    Because the County Council gave the Plan's trustees extraordinarily broad authority to amend the Plan and later effectively ratified all of the trustees' amendments, the trustees acted within their authority when they independently added certain augmented benefits for those who were "involuntarily separated" from County service.

J. Joseph Curran, Jr.
*Attorney General*

Jack Schwartz
*Chief Counsel*
 *Opinions & Advice*